In re **JORGES CARPET MILLS, INC.,** Debtor.

C. Kenneth **STILL,** Trustee, Plaintiff,

v.

S. RASNICK CO., INC., Defendant.

Bankruptcy No. 1–80–02516.
Adv. No. 1–81–0137.

United States Bankruptcy Court,
E.D. Tennessee.

May 10, 1984.

Howard W. Jones, Calhoun, Ga., for plaintiff.

James H. Bisson, III, and Warren Coppedge, Jr., Mitchell, Mitchell, Coppedge, Boyett, Wester & Bates, Dalton, Ga., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

In December, 1980, creditors filed an involuntary bankruptcy petition against Jorges Carpet Mills, Inc. (Jorges). About this time, Jorges transferred to S. Rasnick and Company, Inc., (Rasnick) a large quantity of carpet yarn and numerous metal storage baskets used in shipping the yarn.

The court entered an order for relief as to Jorges and appointed C. Kenneth Still as trustee. 11 U.S.C. § 1104. The trustee brought this suit against Rasnick to recover the baskets or their value and to recover the difference between the alleged value of the yarn and the price paid by Rasnick.

Some of the transfers were made between filing of the petition and entry of the order for relief.

■ The fact that they occurred before the order for relief makes no difference to the trustee's right to avoid them as post-petition transfers. Section 303(f) authorizes transfers by the debtor during this "involuntary gap" period, but § 549(a) allows the trustee to avoid transfers of property of the bankruptcy estate after *commencement* of the case, which is the time of filing of the petition. 11 U.S.C. §§ 303(b) & (f), 541(a) & 549(a). Section 549(a) provides:

(a) Except as provided in subsections (b) and (c) ... the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized under section 303(f) ... of this title; or

(B) that is not authorized under this title or by the court.

As to the transfers after the order for relief, no one has contended that they were authorized even though the involuntary petition was filed under chapter 11 of the Bankruptcy Code. See 11 U.S.C. §§ 363(c)(1), 1106 & 1108. Thus, all the post-petition transfers are subject to avoidance under § 549(a).

■ Transfers during the involuntary gap period are partially protected under § 549(b). It provides:

(b) In an involuntary case, a transfer that occurs after the commencement of such case but before the order for relief is valid against the trustee to the extent of any value, including services, but not including satisfaction or securing of a debt that arose before commencement of the case, given after commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

This in effect means that the trustee can recover to the extent the property transferred was worth more than what the transferee paid.

There is no statute specifically extending this protection to transfers after the order for relief, but the same result should be reached at least when the transferee takes in good faith. See 11 U.S.C. § 550(c) & (d).

■ As to all the postpetition transfers the trustee is generally entitled to recover to the extent the value of the yarn and the baskets exceeded the price paid by Rasnick. As to the baskets, the trustee contends that they were not included in the sale of the yarn and Rasnick paid nothing for them. Of course, the trustee can also recover if the baskets were included in the sale but Rasnick paid less than they were worth. As to the yarn, the trustee con-

tends that Rasnick paid much less for the yarn than it was worth.

Essentially the same rule applies to the pre-petition transfers under § 548(a)(2) of the Bankruptcy Code, except that the trustee must also prove that Jorges was insolvent at the time of the transfers. During the testimony of the trustee's accountant, Rasnick's attorney indicated that it did not dispute Jorges's insolvency at the time of the transfers. The accountant testified that Jorges was insolvent at the time and had been for several years. There was no contradictory evidence.

### Findings of Fact

■ For some years prior to the filing of the involuntary petition against Jorges, it was engaged in the manufacture of carpet. It was also in financial difficulty. In 1977 it had filed a petition for reorganization under chapter XI of the Bankruptcy Act of 1898. Jorges was operating under the reorganization plan confirmed in that case when the involuntary petition was filed on December 19, 1980.

Rasnick was engaged in the buying and selling of yarn used in the manufacture of carpet. The yarn is generally packaged on cone-shaped spools. A spool of yarn is often referred to as a cone. A cone that has been mostly used and has little yarn remaining is called a "skinner".

The yarn is generally shipped in cardboard boxes, but wire baskets like those in question are sometimes used. A wire basket is about 2 to 3 feet high, 3 to 4 feet wide, 3 to 4 feet long, and weighs 115 to 120 pounds. The sides of the higher quality baskets fold down for flat storage. Apparently some or most of the baskets in question had folding sides.

The baskets are used in the warehouse for storage and during the manufacturing process to hold the yarn so that it can be easily reached.

Art Kanfer was Rasnick's agent in buying the yarn from Jorges. He testified as follows. Ed Jorges negotiated the sale on Jorges's behalf. He showed Kanfer yarn in Jorges's plant and warehouse. The yarn in the plant was mostly small packages, not full cones. The yarn in the warehouse included two large lots. Kanfer understood that he was buying all the yarn he saw and that the sale was a going out of business sale. He asked Ed Jorges if the yarn in the baskets would be boxed and Ed Jorges told him that Rasnick would get the baskets. He offered Ed Jorges 45 cents per pound for all the yarn including the baskets. Ed Jorges cleared the sale with Charles Housch, who was the chief executive of Jorges. The yarn did not include any original, unopened boxes. Without the baskets, it would have been worth 30 to 35 cents per pound. This sale included about 60,000 pounds of yarn and was the largest odd lot sale negotiated by Kanfer. The yarn was shipped out in six truck loads. All the trailers were "pretty full". When a truck was full, the total price was figured and Rasnick had to wire the money before Jorges would release the truck. Kanfer had no idea what the baskets would sell for separately.

Mike Parker worked in the warehouse at Jorges when the yarn was shipped. He testified as follows.

The wire baskets were used in the warehouse for storage. At least 115 to 120 were shipped to Rasnick and perhaps as many as 150 to 160. Parker didn't keep an exact count. He did weigh the boxes and baskets. At some time during the shipping, Ed Jorges came to the warehouse and complained about the baskets being shipped to Rasnick. Parker thought that his supervisor, Eddie Adams, and Art Kanfer were present at the time.

One-half to 70% of the yarn shipped to Rasnick was in full cones or nearly full cones. The balance was skinner. Art Kanfer was present during the loading. He preferred the lots with fuller cones and the better grade yarn. R.L. Hill was buying yarn at the same time. Hill bought the cheaper stuff and more skinners. Parker didn't remember what Hill paid for the yarn. Parker admitted that he doesn't have much expertise as to yarn but reiter-

ated that Rasnick bought the better quality yarn.

Eddie Adams was Mike Parker's supervisor at the time. Adams testified as follows.

He told Mike Parker to be sure to count the baskets. There were 152 shipped to Rasnick. All were in fairly good condition. Parker didn't tell him that he hadn't kept an exact count. Wire baskets generally aren't shipped. They're used in the warehouse. Yarn to be shipped is boxed, but Jorges ran out of boxes to use for the yarn sold to Rasnick. He was not involved in any other sales in which baskets were used for shipping.

The cheaper yarn and more skinner cones were sold to R.L. Hill for 45 cents per pound, the same price that Rasnick paid, but Kanfer was allowed to pick the better, bigger lots with more full cones. Adams thought that Jorges was selling Rasnick first line yarn at a junk yarn price because the company was in trouble.

He thought that 7 or 8 truckloads were sent to Rasnick. It would take only 2 truckloads for full cones in new boxes, but junk yarn and skinners require more space for the same weight and thus more trucks.

Neither Eddie Adams nor Art Kanfer remembered hearing Ed Jorges complain about the number of wire baskets being shipped to Rasnick.

Herbert Rasnick testified as follows.

Ed Jorges called Rasnick to ask if it was interested in buying some odd lot yarn, some of it in wire baskets. Rasnick was interested in buying the yarn on an "as is, where is" basis. The only unusual thing about the deal was the requirement that payment be made by wire transfer before the yarn was shipped. It was not unusual to buy this large an amount in odd lots. The 60,000 pounds was only about 3% of Rasnick's purchases in 1980. Most of the yarn at the Calhoun, Georgia warehouse was bought in North Georgia.

Mr. Rasnick understood that the deal included the baskets. In his experience, sales of yarn in baskets included the baskets about half the time. Rasnick still had on hand 73 baskets from the Jorges deal. Mr. Rasnick hadn't inspected them to see what condition they were in. He admitted that other baskets that had been emptied might have entered the general stock and not be distinguishable as Jorges's baskets. About 10% of the yarn bought by Rasnick included the baskets.

A large amount of the yarn was tones or "J" yarn, as much as one-half of the total. The remainder was a "Duke's mixture". The price was figured first according to what Rasnick thought it could resell the J yarn for. An arbitrary value was given the remainder. The price allowed some value for the baskets. The J yarn was resold after repackaging. Even after repackaging, none of it could reliably be put into large lots.

The first time he saw the yarn was several weeks after the sale. Rasnick buys only substandard or odd lot yarn. None of the yarn was in original, unopened boxes. About 20% was in full cones of natural color. This 20% was worth 45 to 60 cents per pound altogether. The remaining 80% was skinner and other.

The J yarn, which was about 50% of the total, was rewound by Rasnick. The highest resale price for any of the rewound yarn was 65 to 75 cents per pound. The costs of resale were as follows:

| | |
|---|---|
| Freight in | 4 cents per pound |
| Rewinding | 12 cents per pound |
| Packaging | 3 cents per pound |
| Delivery | 1.5 cents per pound |
| Sorting | 2 cents per pound |
| | |
| TOTAL | 22.5 cents per pound |

"Freight in" was higher than usual because so many truckloads were required.

He did not know about the filing of the involuntary petition against Jorges. He didn't think Jorges was in any more financial trouble than it had been.

Mr. Rasnick said he wouldn't make the same deal again. The yarn was worse than he thought. The remaining 30,000 pounds was worth only about 25 cents per pound but might be worth more later.

Sid Tindol testified as follows.

He had been in the carpet yarn business for 17 years. His company sold yarn to Jorges in 1980. In May, 1983, he inspected some of the yarn that Rasnick bought from Jorges. He saw about 3,000 to 7,000 pounds of the 30,000 pounds still on hand. Most of what he saw was junk—what he called "floor sweepings". It was worth less than 50 cents per pound. He would expect that two years after the purchase from Jorges the dregs would remain.

There were a few cases, as much as 1,500 to 2,000 pounds, of the kind of yarn that his company sold to Jorges in 1980 for $1.55 to $1.60 per pound in lots of 15,000 to 30,000 pounds. The price of yarn varies directly with the quantity sold. A few cases are worth much less per pound than 4,000 to 5,000 pounds of the same yarn.

Wire baskets used in shipping are generally returned to the seller because of their cost to the seller compared to cardboard cases. He had not bought or sold any wire baskets.

His company was sued in Jorges's earlier bankruptcy, but the suit was settled. The settlement was not in any way dependent on his testimony in this case.

J.D. LeMay testified as follows.

He had been in the carpet business for 22 years. He had been buying odd lot yarn from Rasnick for several years. He looked at the remainder of the yarn that Rasnick bought from Jorges. It was a mixture of everything used in the carpet business. Since it was more than two years after the purchase it was probably the dregs of what Rasnick bought. He valued it at 20 to 25 cents per pound and didn't think its value had changed much since 1980 or 1981. The best he saw would be worth $1.75 to $1.80 per pound if all 60,000 pounds were that kind. A fair price would be $1.00 per pound for the average quality if all 60,000 pounds were that quality.

The cost of rewinding yarn was about 16 to 19 cents per pound as follows:

| Rewinding | 10–12 cents per pound |
|---|---|
| Repackaging | 4– 5 cents per pound |
| Freight | 2 cents per pound |
| TOTAL | 16–19 cents per pound |

He had bought and sold odd lot yarn in wire baskets. Some, but not much, yarn was sold in baskets with the baskets included in the sale. Including the baskets adds 15 to 16 cents per pound to the cost depending on how much yarn is in an average basket. The price is figured by adding enough to the price of an average basket of yarn so that the basket costs $35 to $40. If the baskets are to be returned, the buyer generally doesn't pay a deposit; the bill of lading is marked to show that the baskets are to be returned. He mentioned one occasion when he bought odd lot yarn in baskets. He and the seller discussed return of the baskets before the yarn was shipped. He didn't think there was a custom in the trade because so little yarn was sold in baskets.

Robert E. Lee testified as follows.

He had been in the yarn business for about 10 years. He had bought and sold yarn that was shipped in wire baskets. The custom in the business is to return wire baskets used for shipping. Yarn is generally sold by the pound excluding the weight of the container. Yarn that he bought at a going out of business sale was shipped in wire baskets but he had to pay a deposit on the baskets to assure their return. Usually when the baskets are to be returned, a separate bill of lading is made out for the baskets. He sold odd lot yarn to J.D. LeMay and shipped it in wire baskets. Mr. LeMay understood that the sale didn't include the baskets. During the negotiations, Mr. LeMay asked when the baskets would be picked up. The custom in the business is to return wire baskets used for shipping.

Two years earlier he had bought baskets in excellent condition for $75 each. They were the fold-down kind. He would expect to pay only about $50 for a basket that wouldn't fold. He thought that 45 cents per pound for yarn was too low a price to include baskets worth $75 each.

A basket will hold up to 500 pounds of yarn in full cones. The less yarn there is on the average cone the more baskets it will take to ship the same weight of yarn.

James W. Foster testified that as accountant for the trustee he assumed control of Jorges's books and records in January, 1981. He analyzed Jorges's yarn purchases for 1980. Jorges bought very little yarn in odd lots. It bought large lots from Mr. Tindol's company, Adventure Industries, for $1.65 to $2.00 per pound. It bought some J yarn for less—down to $1.05 per pound. Jorges also bought yarn from Universal for 60 cents per pound. He was not aware whether Jorges was paying too much for yarn because of its poor credit. He admitted that the price of yarn cannot be generalized.

Brent Manley testified that he bought wire baskets at two auctions of Jorges's property for $45 and $99 each. All were in good condition. He had not seen the baskets shipped to Rasnick. The difference in price was because of the difference between bidders at the sales.

C. Kenneth Still, the trustee, testified that small lots of yarn were sold to R.L. Hill for less than 40 to 45 cents per pound. The sale to Rasnick worked out to 45 cents per pound by dividing what Rasnick paid by the amount of yarn shipped. The wire baskets that he auctioned were sold for $45 and $99. They were in good condition. Based on his 15 years as a trustee, he thought that manufacturing people bid higher for goods or machinery used in manufacturing. That was why the baskets sold for more at the sale that involved mostly equipment.

### Discussion

In this case, the evidence as to the value of the yarn, *not including the baskets,* did not convince the court that 45 cents per pound was too low a price for the yarn.

The trustee's accountant testified that the debtor paid $1.05 to $2.00 per pound for the yarn in large lots. However, the resale value of yarn depends not only on the kind of yarn but also on the size of the lots and the average amount of yarn on each cone.

The witnesses disagreed on the amount of yarn that was in full or nearly full cones. Mike Parker, who actually took part in the loading, testified that one-half to 70% of the total was in full or nearly full cones. Parker and his supervisor, Eddie Adams, both said that Art Kanfer picked the bigger and better lots for Rasnick. Adams also testified that 60,000 pounds would be two truckloads of full cones. This transfer took six truckloads. Art Kanfer testified that very little of the yarn was in full cones. Most of it was in small packages. Herbert Rasnick testified that 20% of the total was in full cones of natural color yarn and the remaining 80% was in less than full cones.

The court is inclined to believe Parker and Adams ahead of Kanfer and Rasnick, who have a more direct interest in the case. Furthermore, Parker and Adams should have been more familiar with what was actually shipped. Their testimony at best fails to show that a high percentage of the yarn was in full cones. Parker said only that 50% to 70% was in full or *nearly* full cones. The fact that six truckloads were required to move 60,000 pounds also suggests that much less than 50% of the yarn was in full cones. The fewer full cones the more rewinding is needed to resell the yarn.

In that situation the size of the lots should be very important to the resale value of odd lot yarns. Larger lots sell for more, apparently because they are more useable. Herbert Rasnick testified that 20% of the yarn (12,000 pounds) was in full cones of natural color yarn. This may have been the largest single lot. Mr. Rasnick valued it at 45 cents to 60 cents per pound. Mr. Rasnick also testified that 50% of the total (30,000 pounds) was J yarn that was rewound, but after rewinding there were no large lots of J yarn.

Sid Tindoll testified that what he saw of the remaining 30,000 pounds was probably the dregs of the whole amount and was worth less than 50 cents per pound. He

did see some yarn of the kind his company sold to the debtor in 1980 for $1.55 to $1.60 per pound in lots of 15,000 to 30,000 pounds. J.D. LeMay testified that he also saw the remaining yarn, that it was probably the worst of the total, and that it was worth 20 cents to 25 cents per pound when Rasnick bought it. He said the best would have been worth $1.75 to $1.80 per pound and the average worth $1.00 per pound *in one 60,000 pound lot* of the same kind. Taken together, the testimony of Tindoll and LeMay says very little about the value per pound of 60,000 pounds of mixed yarn.

Finally the trustee testified that the debtor sold worse yarn to R.L. Hill for less than 40 cents to 45 cents per pound.

The court simply cannot find sufficient convincing evidence to show that the yarn by itself was worth more than 45 cents per pound.

That leaves the question of whether Rasnick paid anything or a fair price for the wire baskets. The testimony of Art Kanfer and Herbert Rasnick was that the baskets were included in the sale. The contradictory evidence was not convincing. The question then is whether Rasnick paid fair price for the baskets.

Mr. Rasnick's testimony was confusing. The witnesses seemed to agree that Rasnick still has 30,000 pounds of the yarn. Mr. Rasnick said the other 30,000 pounds was J yarn that was repackaged and resold. He also said that 12,000 pounds (20% of the total) was natural color yarn in full cones. Apparently the 12,000 pounds of natural color yarn was included in the 30,-000 pounds that was resold. Since the 12,000 pounds of natural color yarn was already in full cones, the resale costs should have been much less than the 22.5 cents for the remaining 18,000 that had to be resold.

The valuations given by the witnesses can be summarized as follows:

(1) 12,000 pounds at 45 to 60 cents per pound

(2) 18,000 pounds resold at 65 to 75 cents per pound after repackaging costs of 22.5 cents per pound

(3) 30,000 pounds worth as little as 20 to 25 cents per pound and less than 50 cents per pound in any event.

The yarn could be valued as follows:

| | | | | | |
|---|---|---|---|---|---|
| 12,000 pounds at | 45 | to | 60 | cents per pound |
| 18,000 pounds at | 35 | to | 45 | cents per pound |
| 30,000 pounds at | 20 | to | 45 | cents per pound |
| 60,000 pounds at | 29.5 | to | 48 | cents per pound |

The average would be 38.75 cents per pound or 6.25 cents per pound less than what Rasnick paid. If the price was intended to include the wire baskets, the 6.25 cents could be attributed to the baskets. This would be $3750 (60,000 × $0.0625) for 152 baskets or $24.67 per basket.

Mr. LeMay testified that when the baskets are included in a sale the yarn is priced up to pay $35 to $40 for each basket. He did not explain why baskets are sold so cheaply in this situation compared to auction prices of $45 to $99 per basket. A yarn dealer may not want the baskets to use, but $35 to $40 is a low price even for a buyer who intends to resell at a profit. The court is of the opinion that $75 per basket would have been a fair price. The trustee should recover the difference between what Rasnick paid and $75 per basket. For the 152 baskets, the total recovery is $7,650.16. The court will enter judgment for the trustee in that amount.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.